IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ERIC WIBERG,

                          Plaintiff,                              OPINION AND ORDER

        v.
                                                                  22-cv-686-wmc

PIXELLE SPECIALTY SOLUTIONS, LLC,

                          Defendant.

---

Plaintiff Eric Wiberg filed this civil action against his former employer, Pixelle Specialty Solutions, LLC, claiming violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a). More specifically, Wiberg contends that Pixelle failed to reasonably accommodate, unfairly disciplined him for, and ultimately terminated his employment because of his disability *and* use of FMLA leave. Before the court are the parties' cross-motions for summary judgment on Wiberg's claims. (Dkt. #34 and Dkt. #43.) Because disputes of fact preclude the entry of summary judgment for either party, the court will deny both motions in their entirety.

UNDISPUTED FACTS[1]

### A. Background

Plaintiff Eric Wiberg is a process and production engineer. In 1985, he began working at Consolidated Papers, which through a series of mergers and acquisitions, eventually became defendant Pixelle, a specialty paper manufacturer based in Spring

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings, responses, and other evidence.

Grove, Pennsylvania.  Over the next three decades, Wiberg held a series of engineering and supervisory positions at various manufacturing facilities in central Wisconsin.  In August 2018, Wiberg accepted an offer to serve as an Operations Maintenance Coordinator ("OMC") at a paper mill in Stevens Point, Wisconsin.[2]

As the OMC for Paper Machine 35, Wiberg was required to complete four monthly safety assignments:  (1) a safety accountability conversation; (2) attendance at a safety meeting; (3) a key safety procedure audit ("KSPA"); and (4) a hazard recognition check ("HRC").  Safety accountability conversations, KSPAs, and HRCs can take place on the mill's operating floor or other areas of the facility, although according to Wiberg, all KSPAs were ultimately conducted on the operating floor.  (Dkt. #66, at 43-44.)  In addition, Wiberg was required to memorialize any safety accountability conversations, KSPAs or HRCs in an online portal, with Pixelle maintaining "scorecards" tracking managers' safety check compliance and providing them with monthly email updates.  In his role as OMC, Wiberg reported to Paper Machine Area Manager Gary Gordon.

**B.  Wiberg's First Ankle Surgery and Work Restrictions**

In January of 2019, Wiberg began to experience left ankle pain that made it difficult and painful for him to walk.  This pain became excruciating after he completed the American Birkebeiner Ski Race the following month.[3]  On May 23, 2019, Wiberg

---

[2] Pixelle purchased the Stevens Point paper mill from Verso Corporation in late 2019.  The Stevens Point facility is one of the largest paper mills in the United States, capable of producing some 210,000 tons of packaging, wrapping, and label paper annually.

[3] Although truncated at certain times due to a lack of sufficient snow, the American Birkebeiner -- popularly known as the "Birkie" -- is the largest Nordic skiing competition in North America, with races for skate and classic skiers that are 50 and 53 kilometers long, respectively.  SLUMBERLAND AMERICAN BIRKEBEINER, https://www.birkie.com/ski/events/birkie/ (last visited March 22, 2024).

underwent ankle reconstruction surgery during which physicians repaired two frayed tendons in his foot, replaced ankle ligaments, removed a bone spur, and lengthened his Achilles tendon.  Although Wiberg had not requested any accommodations from Pixelle before his surgery, he was granted FMLA leave by Pixelle between his May 23rd surgery and June 10, 2019.

During his first six weeks after returning from leave, Wiberg was further restricted to sedentary office work.  When moving about the mill, Wiberg was also required to wear a boot and ride a knee scooter.  All of these restrictions were recognized and documented by an occupational health nurse at Pixelle on June 20 and July 3, 2019.

As a result of these restrictions, Wiberg could not safely leave the designated visitor walkway to complete safety checks on the mill's operating floor until his physician released him from wearing a boot and using a knee scooter on September 23, 2019.  Nevertheless, Wiberg was still able to communicate with operators in the control room, conduct safety checks in the office building, and perform housekeeping audits.

### C. Wiberg's 2019 Performance Evaluation

Before the onset of Wiberg's ankle pain and his first FMLA leave in 2019, Wiberg received substantially favorable performance evaluations, including in his December 2018 performance review from Area Manager Gordon.  However, Wiberg's December 2019 performance evaluation -- which took place after a year of ankle pain, ankle surgery, weeks of FMLA leave, and several months of workplace restrictions -- rated him unfavorably for the first time on a range of safety- and productivity-related metrics.  In certain cases involving matters of collective responsibility, Wiberg also received worse ratings than other

managers with whom he shared control or accountability. Wiberg was further criticized for not meeting his required number of safety accountability discussions or KSPAs. Wiberg had not completed KSPAs in April, May, June, July, August, October, or December of 2019. Finally, the review identified two major areas in which Wiberg could improve: safety leadership and maintenance support.

Because Wiberg had not received any negative feedback during the previous year indicating dissatisfaction with his performance, he was unpleasantly surprised by this 2019 review. Moreover, Wiberg maintains that the absence of such feedback during the year reflected his supervisors' understanding of his physical limitations due to his injury, later surgery, and long recovery.

### D. Wiberg's 2020 Ankle Surgery

Unfortunately, Wiberg's ankle pain worsened during the first few months of 2020. As a result, the General Manager of Pixelle's Stevens Point operations, Craig Helgeson, noticed that Wiberg had a visible curvature of the back and walked with his right foot perpendicular to his left foot. In mid-June of 2020, Wiberg told his supervisors that his ankle pain made it extremely painful to walk and prevented him from doing any safety checks. As a result, Pixelle allowed Wiberg to work from his office, at least in part. Wiberg also advised his supervisors that he would have to work with mill management on how to complete his safety leadership responsibilities as a result of his injury. (Dkt. #67, ¶ 51.) Nevertheless, Wiberg completed KSPAs in June and July 2020.

Wiberg underwent ankle replacement surgery on July 23, 2020, after requesting and being granted FMLA leave from July 23 until August 10, 2020, for the operation and

subsequent recovery time.  On August 11, 2020, Wiberg again returned to work with restrictions that barred him from walking, required him to wear a boot, provided for use of a knee scooter, and limited him to desk work.  Wiberg's doctor placed him on these restrictions until September 10, 2020, and specifically prohibited him from going out on the plant's operating floor during this recovery period.

### E.  Wiberg's 2020 PIP

Just two days after he returned to work from his second ankle surgery -- on August 13, 2020 -- Wiberg was placed on a performance improvement plan ("PIP") by Production Manager Jason Zblewski.  The PIP highlighted four areas where Wiberg's performance was allegedly deficient and needed improvement:  (1) Safety Leadership; (2) Day-to-Day Maintenance; (3) Outage Planning/Execution; and (4) Relationships.  In support, the PIP cited Wiberg's performance metrics, failure to complete certain required tasks, and need to engage in "repair sessions" with unnamed employees.  The PIP required that Wiberg meet certain performance standards to demonstrate progress towards achievement of each identified improvement goal going forward.  Wiberg was also instructed to work with two mentors for Hazard Identification and Day-to-Day Maintenance Improvement during the PIP's duration.

Wiberg disagreed with many of the statements in the PIP and felt that they did not accurately reflect his FMLA absence, physical restrictions during the year, improvements in performance, or the actual scope of his job responsibilities and requirements.  At the same time Wiberg received the PIP, he was also presented with his mid-year Performance Appraisal for 2020.  Over the course of that year to date, Wiberg received marks for having

"met or exceeded" almost all of his actual goals, including for (1) Productivity; (2) Quality; and (3) Cost/Budget.  However, the mid-year appraisal also noted some shortcomings in (4) Safety and (5) People.  As to the former, despite a target closure rate of 100 percent on "SAF Work Orders" within his area of responsibility, only about two-thirds had been completed.  (Dkt. #38-10, at 2.)  With respect to the latter, the review noted "some issues" during the outage planning and execution process.  (*Id.* at 3.)  While Wiberg had shown "some signs of improvement" over the course of 2020, the review's summary findings concluded the PIP would be necessary "to ensure that [his] performance going forward meets [Pixelle's] expectations."  (*Id.*)

Because he was afraid of losing his job, Wiberg called his doctor immediately after receiving the PIP and asked for removal of the restriction barring his access to the operating floor.  The very next day, Wiberg also submitted an updated work restrictions form to Pixelle, indicating that he was allowed on the operating floor, if only on the visitor walkway.  Still, for the following month, Wiberg could only perform tasks that were accessible from his office or that walkway.  As a result, although his name was listed on a KSPA dated August 26, 2020, Wiberg maintains that because of his ongoing medical restrictions, the audit was conducted by Area Manager Gordon, who also completed the form itself.  (Wiberg Decl. (dkt. #64).)  In an effort to remove any work restrictions altogether, Wiberg next asked his doctor to move up his scheduled post-operative evaluation from September 21 to September 15, 2020.  At that appointment, Wiberg's doctor further agreed to remove the remaining restrictions at his request.  Wiberg was subsequently able to move freely about the mill floor without a walking boot or scooter.

Moreover, as of Wiberg's 30-day assessment and 60-day check-in, management indicated that he was meeting his goals under the PIP. At Wiberg's 60-day check-in, Gordon specifically noted that he had made improvements in all areas, including Safety Leadership.

### F. Wiberg's Termination

Nevertheless, at a check-in meeting in early November of 2020, Production Manager Zblewski notified Wiberg that he had not timely completed an HRC or KSPA for the month of October, further explaining that the PIP would have been a "slam dunk" if he had just completed them. (Dkt. #66, ¶¶ 140-42.) Soon after that meeting, Wiberg texted Gordon to ask "how much danger" he was in. (*Id.* at ¶ 149.) Wiberg also informed Gordon that he *had* conducted both the October HRC and KSPA. (*Id.* at ¶ 143.)

On November 9, 2020, Pixelle management, which included Gordon, Helgeson, and Zblewski, decided to fire Wiberg. They then did so the very next day. Wiberg was told that the reason for his termination was his failure to complete the October HRC or KSPA. While Wiberg maintains that he simply failed to record them in Pixelle's online portal, the company contends that there is no evidence he ever actually did them at all. The parties also dispute whether reports of HRCs or KSPAs can be submitted to the portal within a reasonable time after they take place. (Dkt. #66, at 34-35.) In addition, Zblewski later acknowledged that Wiberg had completed all of the tasks outlined in his PIP aside from those safety checks in October. (Dkt. #67, ¶ 124.)

Two months after his termination, Wiberg filed a discrimination charge against Pixelle with the Wisconsin Department of Workforce Development ("DWD"). On

October 15, 2021, the DWD dismissed that charge, finding that there was no probable cause to believe that Pixelle had violated the Wisconsin Fair Employment Law.  Just over a year later, Wiberg filed the operative complaint in this case.

OPINION

Summary judgment is appropriate if the material facts are not genuinely disputed and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In employment discrimination cases . . . the summary judgment standard [is applied] with rigor because intent and credibility are crucial, often determinative, issues."  *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998).

The court reviews the parties' cross-motions for summary judgment "construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party."  *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).  However, the court "may not grant summary judgment for either side unless the admissible evidence as a whole -- from both motions -- establishes that no material facts are in dispute."  *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012).  Here, the material disputes of fact will certainly require that the jury decide questions as to intent and credibility at trial.

## I.  FMLA Claims

The FMLA generally provides covered employees who suffer from a serious medical condition with as many as twelve weeks of unpaid leave during any twelve-month period.

8

*Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012); 29 U.S.C. § 2612(a)(1)(D). Employers can neither interfere with an employee's use or attempted use of FMLA leave, nor can they retaliate against him for it.  29 U.S.C. § 2615(a)(1)-(2).  Since plaintiff claims that defendant did both, the court analyzes each claim separately below.

### A.      Retaliation

Employers cannot rely on an employee's use of FMLA leave as a negative factor in employment actions.  *Pagel*, 695 F.3d at 631; 29 C.F.R. 825.220(c).  A plaintiff seeking to demonstrate FMLA retaliation "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007)).  A plaintiff does not need to prove that retaliation was the *only* reason for an employer's adverse employment action; instead, he may establish a claim by showing that the exercise of his rights under the FMLA was a substantial or motivating factor in the action.  *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022).  Moreover, the Seventh Circuit has reiterated that district courts need not separate evidence into "direct" or "indirect" evidence, but should simply consider whether a reasonable factfinder could conclude that the protected factor led to the adverse employment action.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

To support his claim of retaliation, plaintiff asserts that several of defendant's actions evidence animus towards him for using FMLA leave.  First, he attests that shortly after taking his first FMLA leave in 2019, he received lower performance ratings than his

non-disabled counterparts for identical performance on shared goals. (Pl.'s Br. (dkt. #44) 6.) He also points to the fact that defendant placed him on a PIP just two days after he returned from his FMLA leave in 2020. (*Id.*) Finally, he cites the termination of his employment after a single alleged failure to comply with the PIP on November 10, 2020. (*Id.* at 7.) Although certainly not compelling evidence, the court is also unable to find that no reasonable jury could find a causal connection between his use of FMLA leave and these three adverse employment actions, given as plaintiff points out: (1) the disparities between the evaluation of Wiberg's performance and that of his arguably similarly-situated, non-disabled peers on their 2019 performance reviews; (2) the "suspicious timing" between his use of FMLA leave and his decline in job performance evaluations and placement on a PIP; and (3) evidence that his termination was pretextual, given his compliance with his PIP goals at the 30- and 60-day PIP check-ins. (*Id.* at 8.)

Nevertheless, defendant argues that this claim fails because: (1) plaintiff had received notice of his underperformance in fulfilling his safety responsibilities several months before his second FMLA leave in 2020; (2) plaintiff failed to complete his required monthly safety assignments in April and October 2020, when he was not on restricted duty; and (3) plaintiff was not on FMLA leave at the time of his termination. (Def.'s Br. (dkt. #41) 9-12.) Defendant also argues that any retaliatory animus is undermined by the history of accommodations that plaintiff was afforded in connection with his ankle injury (*id*. at 12-13) up to that point, as well as disputes plaintiff's contention that he was subjected to an unequal application of standards that resulted in his lower performance ratings relative to other employees. (Def.'s Opp. (dkt. #57) 12-13.)

However, none of these disputes are appropriate for resolution on summary judgment.  Indeed, the causal link necessary to prove a retaliation claim can often be established by "showing that there was a suspiciously short period of time between the employee's [protected activity] and the adverse employment action" alone.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007).  A retaliation claim can also be established by proving "a chronology of events from which retaliation can be inferred."  *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987).  Although a jury might struggle to find that the six months between plaintiff's first FMLA leave in 2019 and his adverse performance review for that year were "suspiciously short[,]" no such problem exists with respect to the two days that elapsed between plaintiff's return from his second FMLA leave in 2020 and the imposition of his PIP.  In each of those cases, defendant also cited plaintiff's shortcomings on "safety leadership tasks."  Drawing all reasonable inferences in plaintiff's favor, therefore, a reasonable jury *could* find that plaintiff's uses of FMLA leave -- during which he was unable to complete those same tasks -- led to his adverse performance review in 2019 and, subsequently, to the 2020 PIP that resulted in his arguably precipitous termination after three decades of employment.

When the facts are viewed in the light most favorable to defendant, a reasonable jury could just as easily find that plaintiff's negative reviews, PIP, and termination had nothing to do with his use of FMLA leave.  In defendant's telling, plaintiff did not actually complete or document KSPAs in April and October of 2020, and as a result of the latter failure, he could not meet the terms of his PIP and was terminated as a result.  However, defendant's analysis overlooks two crucial disputes of fact that ultimately doom its motion for summary judgment as to all of plaintiff's claims.  *First*, plaintiff maintains that he did,

in fact, complete the October HRC and KSPA.  Although the record contains scant evidence to support his contention, a finder of fact may credit the texts plaintiff sent to Gordon in early November of 2020 saying he "did a lockout KSP" and "a pre-job safety checklist" in October of 2020.  (Dkt. #38-26.)  Even a party's own, "self-serving" testimony can be enough to defeat a motion for summary judgment where it has some evidentiary support.  *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 175 (7th Cir. 2011).  Indeed, "credibility issues are to be left to the trier of fact to resolve on the basis of oral testimony except in extreme cases," because that testimony "must be not just implausible, but utterly implausible in light of all relevant circumstances."  *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).  This is not such a case.

*Second*, plaintiff contends that he had a window of time to submit documentation that he completed the October HRC and KSPA, and defendant did not give him that opportunity because it was looking for a reason to terminate him.  If the jury agrees -- and, as the parties concede, the *only* stated reason for plaintiff's termination under his PIP was his failure to submit that documentation -- defendant's actions may be viewed as additional data points on the "chronology of events" from which retaliation can be reasonably inferred.  Again, the evidence for plaintiff's contention is limited, comprising testimony from Craig Helgeson and Organizational Change Management Lead Doreen McDonald.  (Pl.'s Opp. (dkt. #61) 2-3.)  However, at his deposition, Helgeson testified that plaintiff would not have been terminated if he had in fact conducted the safety checks *and* had documentation to prove it.  (Helgeson Dep. (dkt. #52, at 44:19-24).)  Similarly, while it is undisputed that plaintiff lacked documentation when he was fired, a jury *could* reasonably interpret McDonald's deposition testimony as suggesting that documentation, at least of

safety leadership tasks, can be completed within a reasonable time after the fact. (McDonald Dep. (dkt. #54, at 23:6-13).)  Where deposition testimony is "ambiguous or incomplete . . . the witness may legitimately clarify or expand upon that testimony by way of an affidavit." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999).  In the absence of such an affidavit from McDonald, the court has no basis to preempt a jury's interpretation of which testimony to credit.

Whether a jury could also reasonably find that plaintiff was treated worse than similarly-situated co-workers after taking his FMLA leave -- and was retaliated against as a result -- presents a close question.  For an individual to be similarly situated to plaintiff, he must show that the individual is "directly comparable to [him] in all material respects" but for his requesting and taking FMLA leave.  *Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citations omitted).  "The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'"  *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quoting *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007)).  Generally, appropriate comparators "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citations omitted).

Here, defendant argues that plaintiff has failed to identify *any* similarly-situated comparators who were treated better than him, and that the other Paper Machine 35 team members against whom he would measure his treatment had different supervisors, different

13

responsibilities, and different expectations.  (Def.'s Opp. (dkt. #57) 13-14.)  However, plaintiff points out that counsel for *defendant* specifically identified three other Paper Machine 35 team members as "similarly-situated managers" in the proceedings related to his state-law discrimination claim before the Wisconsin Department of Workforce Development.  (Dkt. #63, at ¶ 134.)  An attorney's statements can bind a party in later proceedings where counsel makes a factual assertion that is "deliberate, clear, and unambiguous." *Robinson v. McNeal Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) (citations omitted).  Given the parties' extensive disputes over how plaintiff was treated relative to similarly-situated managers -- including disagreements on the safety metrics used to evaluate employees, the methods used to calculate their productivity, and the standards against which they were reviewed -- a jury will need to weigh the evidence pertaining to plaintiff's allegations of disparate treatment as well.

Finally, defendant's argument that it could not have retaliated against plaintiff for taking FMLA leave because he was not on leave when he was terminated lacks any merit, particularly given defendant's awareness that he had taken FMLA leave twice.  Yet just as defendant has not produced sufficient evidence, when viewing the facts in the light most favorable to plaintiff, that it did not retaliate against him for taking FMLA leave as a matter of law, neither can plaintiff definitively prove retaliation when the evidence is viewed in the light most favorable to defendant, particularly given the important safety duties he was expected to fulfill.  Accordingly, plaintiff's FMLA retaliation claim must proceed to trial.

### B. Interference

To prevail on his FMLA interference claim, plaintiff must show the following elements: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). Defendant only disputes the fifth prong of that analysis, arguing that plaintiff was never denied FMLA leave. (Def.'s Br. (dkt. #41) 13.) Defendant further argues that plaintiff's interference claim fails because he never communicated a need for additional FMLA leave after he returned from his second surgery in 2020. (*Id.* at 14.) Meanwhile, as examples of how he was denied his FMLA benefits, plaintiff cites defendant's decision to: (1) impose the PIP in part because he missed a July 2020 discussion on the plant floor while limited to office work; and (2) ultimately terminate him based on safety audit metrics that were not adjusted for his FMLA leave and his failure to record two safety checks he allegedly conducted in October 2020. (Pl.'s Br. (dkt. #44) 10-11 and Pl.'s Opp. (dkt. #61) 10.)

An employer can interfere with an employee's rights under the FMLA by failing to adjust performance standards to avoid penalizing the employee for his or her absence during FMLA-protected leave. *Pagel*, 695 F.3d at 629 (citing *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 743 (7th Cir. 2008)). Interference "also encompasses using the taking of FMLA leave as a negative factor in employment actions." *Preddie v. Bartholemew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015) (cleaned up). An interference claim does *not* require an employee to prove his employer had discriminatory intent. *Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 (7th Cir 2012).

At bottom, plaintiff's FMLA interference claim stands or falls with his PIP, both as to the reasons for its imposition and its use in ultimately terminating him. Plaintiff does not contend that he was denied *additional* FMLA leave, nor does he claim that he was refused any requested FMLA leave. Again, the crux of his argument is that a reasonable jury could find that defendant interfered with his right to take FMLA leave if he was placed on a PIP for failing to complete safety accountability tasks during his FMLA absences. However, that conclusion can only be drawn if defendant (1) actually failed to adjust its performance standards for plaintiff's leave or (2) used his FMLA leave as a factor in deciding to impose the PIP that resulted in his termination. As discussed above, the facts that might bear on those conclusions -- namely, whether defendant appropriately adjusted its expectations because of his FMLA leave and treated him worse than similarly-situated peers for taking it -- are disputed and susceptible to a wide range of interpretations. Because a genuine issue exists as to whether defendant interfered with plaintiff's rights under the FMLA, the court must also deny both parties' motions for summary judgment as to this claim.

## II. ADA Claims

Under the ADA, as amended by the ADA Amendments Act of 2008 ("ADAAA"), "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees[.]" 42 U.S.C. § 12112(a). The ADA prohibits two types of discrimination: (1) failure to provide reasonable accommodation for an employee with a disability; and (2) disparate treatment because of an employee's disability. *Sieberns v. Wal-Mart Stores, Inc.*,

16

125 F.3d 1019, 1022 (7th Cir. 1997).  The ADA also (3) bars employers from retaliating against employees who assert their right to be free from discrimination under the act. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); 42 U.S.C. § 12203(a).  Plaintiff has brought all three types of claims against defendant, which the court also analyzes in turn.

### A. Failure to Accommodate

To prevail on a failure to accommodate claim, plaintiff must show that he was a qualified individual with a disability *and* defendant was aware of his disability but failed to reasonably accommodate his disability.  *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).  Once a covered employer becomes aware of its employee's disability, it must engage in "an 'interactive process' to determine the appropriate accommodation under the circumstances." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998).  The reasonable accommodation requirement "imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee . . . so that, together, they might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working." *Id.*  Title 42 U.S.C. § 12112(b)(5)(A) includes in the definition of discrimination failing to make such an accommodation, "unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business[.]"

Defendant argues that plaintiff's claim must fail because it did reasonably accommodate plaintiff's disability, and even if it did not, plaintiff still could not assert this claim because he was responsible for the breakdown of the interactive process.  (Def.'s Br.

(dkt. #41) 16-21.)   In particular, defendant contends that it discharged any duty to provide a reasonable accommodation by granting plaintiff's request for FMLA leave and desk duty upon his return from surgery, and plaintiff never requested an exemption from completing his required number of safety checks in 2019 and 2020.  (*Id* at 16-17, 19.) This argument appears based on three faulty premises.

*First*, defendant appears to assume that plaintiff's FMLA leave and subsequent desk duty were the *only* accommodations which might have allowed plaintiff to perform the essential functions of his job.   Job restructuring -- which is included on the list of "reasonable accommodations" under the ADA, 42 U.S.C. § 12111(9)(B) -- may also have been appropriate.   However, whether that accommodation would have been possible or successful is unknown on this record, because there appears to have been *no* meaningful interactive process to determine which, if any, accommodations could assist plaintiff in his job.   Moreover, plaintiff has raised a genuine issue as to whether he was, in fact, able to conduct KSPAs from the office environment to which he was restricted in 2019 and 2020 or from the limited areas on the operating floor that he was allowed to access.  (Pl.'s Opp. (dkt. #61) 11.)   Although defendant contends that plaintiff could have inspected walkways, stairs, ladders, power strips, or flammable fluids instead (Def.'s Br. (dkt. #41) 20-21), if plaintiff's comparators only ever conducted KSPAs from the operating floor, the accommodations to which defendant points may well have been illusory.

*Second*, defendant assumes that it had no duty to engage in an interactive process or grant an accommodation that plaintiff "neither requested nor needed."   (*Id*. at 21.) Defendant also points to a single message that plaintiff sent to his supervisor, Gary Gordon, in November of 2019 as evidence that that they were "regularly communicating about the

safety check process." (Def.'s Opp. (dkt. #57) 22.)  While "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches," *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013), the Seventh Circuit has stressed that "[n]o hard and fast rule will suffice"; rather, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).  The regulations similarly contemplate an interactive process initiated by the employer. 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation[,] it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").  In the absence of any additional evidence suggesting that there was regular communication about plaintiff's accommodations beyond a single text message thread, where he asked how to submit documentation of an HRC into defendant's online portal, a reasonable jury may conclude that defendant failed to engage in the interactive process required by the ADA, *or* even worse, was setting him up to fall short of his job requirements.

*Third*, defendant contends that it had no duty to offer plaintiff an accommodation where his physical limitations did not impede his ability to complete safety checks, pointing to (1) his option to conduct KSPAs in an office environment and (2) his ability to complete the goals of his PIP while on restricted duty, only failing them "*after* he was released to return to work without restrictions and no longer required any accommodation." (Def's Br. (dkt. #41) 20-21 and Def.'s Opp. (dkt. #57) 23.)  Yet again, the parties dispute the material facts bearing on those contentions.  As discussed above, it

remains unclear on this record whether plaintiff could, in fact, complete KSPAs in the office environment to which plaintiff was restricted.  Not only does plaintiff suggest that his comparators only conducted KSPAs on the mill's operating floor, but he also contends that Gordon had to complete a KSPA for him in August of 2020 *because* of his medical restrictions.  In addition, if the jury credits plaintiff with actually completing the October 2020 safety accountability tasks that are in dispute, defendant's contention that he only failed the PIP after he no longer needed an accommodation would also lack evidentiary support.  In light of all these disputed facts -- which, in fairness to defendant, are also susceptible to Pixelle's interpretations when inferences are drawn in its favor -- summary judgment must be denied to both parties on plaintiff's ADA failure to accommodate claim.

### B.  Discriminatory Discharge

To demonstrate discrimination under the ADA, plaintiff must not only prove that he is disabled within the meaning of the ADA and qualified to perform the essential functions of the job, either with or without a reasonable accommodation, but also that he suffered an adverse employment action because of his disability.  *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013).  However, if the employer would have undertaken the same action in the absence of a disability, there is no ADA claim.  *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) ("[T]he statute's 'because of' language demands proof that a forbidden consideration . . . was a 'but for' cause of the adverse action complained of.").

Discriminatory motive can generally be shown in one of two ways under the ADA.[4] "Under the direct method, a plaintiff can present either direct or circumstantial evidence to meet its burden." *Dickerson*, 657 F.3d at 601.  The kind of circumstantial evidence that a plaintiff can produce to survive summary judgment includes:  (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.  *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

Alternatively, a plaintiff may "indirectly" prove discrimination under a burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id.* Under this method, "a plaintiff must first establish a prima facie case of discrimination by showing that (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably."  *Id.* Once the plaintiff has established this case, the defendant must identify a legitimate, nondiscriminatory reason for its employment decision.  *Id.*  If the defendant does so, the burden shifts back to the plaintiff to prove that defendant's reason is pretextual.  *Id.*

---

[4] Although the Seventh Circuit has cautioned district courts against "separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards[,]" requiring evidence to be viewed holistically, *Ortiz*, 834 F.3d at 765, it has recognized that "the well-known and oft-used *McDonnell Douglas* framework for evaluating [retaliation] remains an efficient way to organize, present, and assess evidence in [retaliation] cases." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).  Because the parties have adopted the *McDonnell Douglas* framework in their briefing, the court addresses this framework in its analysis.

Plaintiff contends that he has presented sufficient evidence for a reasonable jury to find that defendant intentionally discriminated against him on the basis of his disability, pointing to:  (1) the timing of defendant's actions; (2) his disparate treatment vis-à-vis his peers; and (3) the evidence that his termination was pretextual.  (Pl.'s Br. (dkt. #44) 14-16.)  Defendant counters that plaintiff cannot establish a discrimination claim under the ADA because he cannot show that he was terminated *because of* his disability.  Rather, defendant asserts that it had legitimate reasons for terminating plaintiff and further contends that the record lacks any evidence to suggest that his termination was pretextual. (Def.'s Br. (dkt. #41) 26-27.)  For the same reasons that the court found these arguments unpersuasive in considering plaintiff's FMLA retaliation claim, it finds them insufficient to entitle defendant to judgment on this claim as well.

Again, construing the evidence in the light most favorable to plaintiff, a reasonable jury could find a causal connection between plaintiff's termination and his disability. Plaintiff notes that he only began to receive criticism of his compliance with safety accountability obligations *after* he began to request accommodations for his disability.  He argues that defendant allowed him to take leave and work from his office or designated areas of the operating floor, only to then count the time he was away from work and his inability to conduct safety accountability exercises from the operating floor against him. He further alleges that he was retaliatorily subjected to a PIP as a result of his disability and pretextually terminated due to his failure to meet its conditions, even though he actually did so.  These allegations, along with defendant's claims that it only terminated plaintiff due to his failure to meet attainable safety accountability goals as part of his PIP, and that the PIP's imposition had nothing to do with his disability, all require credibility

determinations that this court cannot make at summary judgment. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

### C. Retaliation

Finally, the ADA prohibits employers from retaliating against individuals who have engaged in protected activities, such as requesting reasonable accommodations. *Rowlands v. United Parcel Serv.-Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018). To prevail on an ADA retaliation claim, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he suffered an adverse action; and (3) there is a causal connection between the two. *Id.* (citing *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018)). At summary judgment, plaintiff "must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012).

In support of his claim, plaintiff once more points to the timing of adverse actions defendant took against him -- specifically, the arguably precipitous imposition of his PIP and his termination -- the "plainly impossible" requirements he had to meet as part of the PIP, which indicate that it was "retaliatory by design[,]" and his disparate treatment relative to at least arguably similarly-situated colleagues who had not requested accommodations. (Pl.'s Br. (dkt. #44) 17.) In turn, defendant reiterates its argument that there was no causal connection between plaintiff's request for an accommodation and the termination of his employment, as well as its grounds for firing plaintiff due to his failure to complete required safety checks on a consistent basis. (Def.'s Br. (dkt. #41) 29-30.)

For the same reasons discussed above -- which the court need not repeat -- all of those disputed facts will need to be resolved by a jury.

Accordingly,

ORDER

IT IS ORDERED that:

1)  Defendant's motion for summary judgment (dkt. #34) is DENIED.

2)  Plaintiff's motion for summary judgment (dkt. #43) is DENIED.

Entered this 22nd day of March, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

24